Filed 1/27/14  Bedi v. Dhaliwal CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| MOHINDER BEDI,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>HARVINDER DHALIWAL et al.,<br><br>　　　Defendants and Appellants. | A135784, A137061<br><br>(Contra Costa County<br>Super. Ct. No. CIVMSC08-02167) |

Mohinder Bedi and Harvinder Dhaliwal were minority and majority shareholders, respectively, of a closely held corporation which owned and operated a gas station. Dhaliwal managed the station and maintained all of its books.  Bedi sued Dhaliwal and other corporations controlled by Dhaliwal (Defendant Corporations) for fraud and breach of fiduciary duty, among other causes of action, when he discovered that the corporation's books were in disarray and that substantial funds were missing from the company.  A jury awarded Bedi compensatory and punitive damages.  The trial court denied Bedi's alter ego liability claims against the Defendant Corporations.

Dhaliwal challenges the verdict, arguing that Bedi's claims were properly derivative corporate causes of action rather than individual claims, that the court erroneously instructed the jury that it could award Bedi additional distributions and missing corporate funds based on a 30 percent pro rata share, and that the trial court erred

1

in not instructing the jury on Dhaliwal's statute of limitations defense. The Defendant Corporations challenge the court's denial of their cost bill.[1] We affirm.

## I. BACKGROUND

A. *Formation and Management of Kismat*

Dhaliwal was a shareholder in eight closely held corporations, six that owned and operated gas stations (the gas station corporations), one that owned hotel properties, and one that owned an office building. Dhaliwal personally or jointly managed the finances of all of the gas station corporations and signed the income tax returns for each.

Kismat Associates, Inc. (Kismat), was formed in 1998 by Dhaliwal, Bedi, and another investor, Surjit Chhatwal. Kismat owned and operated a Chevron gas station in Fremont, California that also included a convenience store and a carwash. Dhaliwal held a 55 percent ownership interest in Kismat (having made a $550,000 initial capital contribution), Bedi held a 30 percent interest ($300,000), and Chhatwal held a 15 percent interest ($150,000).[2] In January 1999, Kismat filed a statement with the California Secretary of State identifying its principal executive office as Dhaliwal's residence in Danville; its directors as Dhaliwal and his wife, Bedi and his wife, and Chhatwal; and its officers as Dhaliwal (chief executive and chief financial officer), Dhaliwal's wife (secretary), and Bedi and Chhatwal (co-vice presidents). The corporation's bylaws required annual noticed shareholder meetings or written shareholder consent in lieu of such meetings.

In September 1999, the shareholders met at Dhaliwal's residence. Dhaliwal described his management duties—cash handling, office management, and accounting

---

[1] Dhaliwal and the Defendant Corporations filed two notices of appeal. The first (No. 135784) was filed on June 21, 2012, following an April 17, 2012 "Judgment" entered on the jury verdict. The second (No. A137061) was filed on November 8, 2012, after a "Final Judgment" was entered on October 12, 2012. We consolidated the two appeals by order on December 26, 2012.

[2] After Chhatwal's death in 2001, his shares were cancelled and reissued to the Savinder K. Chhatwal Trust, and Chhatwal's wife took Chhatwal's place on the board of directors. We refer to these shareholders and directors interchangeably as Chhatwal.

2

(with an assistant manager handling day-to-day operations)—and proposed that he receive 20 percent of net profits to compensate him for those services. The shareholders approved the following resolution: "Resolved that the compensation to the managing partner for managing and operating the corporation will be 20 percent of the net profit of the corporation. After this compensation is paid, the remainder will be divided among all the partners in proportion to their share(s)." There were no subsequent amendments to the resolution.

No other board meetings or annual shareholder meetings took place between 1999 and 2009. Bedi had no involvement in management of the company, with the exception of taking an inventory of the station property on the day Kismat took ownership in February 1999. Bedi regularly asked Dhaliwal how business was going and offered to help with the business, and Dhaliwal consistently assured him the business was going well and declined his assistance.

B.      *Cessation of Distributions and Meetings Between Bedi and Dhaliwal*

From February 1999 through January 2007, Bedi consistently received monthly dividend or distribution checks from Dhaliwal, always in round numbers (multiples of $1,000). At the end of the year, he would receive a tax statement that matched the total distributions he had received during the year.[3] Dhaliwal never explained how he calculated the dividends. Bedi trusted Dhaliwal, and he never saw a profit and loss statement for the company confirming that he was receiving his proportional share of the company's net profits. From 1999 to about 2003, Bedi received between $3,000 and $6,000 a month; thereafter, he received $3,000 a month. When Bedi and his wife asked Dhaliwal why the amount of the distributions had decreased, Dhaliwal said he was building up the company's cash reserves.

---

[3] Kismat was a subchapter S corporation under the Internal Revenue Code, which meant the corporation's net income or loss was reported as income and loss to each shareholder in proportion to the shareholder's stock holdings. (1 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 2013) § 60.01[2][d], pp. 4-11 to 4-12 (rel. 119-6/2013) (Ballantine & Sterling).) Kismat sent Bedi a Schedule K-1 form stating his share of the company's income or loss.

In March 2006, Dhaliwal called the Bedis to a meeting to discuss the station's carwash. They met in a "very plush" office in Blackhawk Plaza with two or three secretaries. A large sign outside identified it as the office of Dhaliwal and Associates, and the Bedis understood that the office was for another business owned by Dhaliwal.[4] At the meeting, Dhaliwal recommended an upgrade of the carwash to eliminate existing high maintenance costs and bring in more business to the station, increasing overall sales and enhancing the business's resale value. He asked Bedi to invest another $48,000 to finance the upgrade. Bedi expressed surprise because he thought Dhaliwal had been building up the company's cash reserves, and Dhaliwal explained that he had spent all of the reserves on maintenance of the old car wash. Dhaliwal did not allege that Kismat was unprofitable. Bedi agreed to invest an additional $48,000 and he did so in 2006, which was at a time when Dhaliwal was expanding his business holdings (Dhaliwal Enterprises, Inc., purchased two hotels in 2006 & 2007; Sidhwal Associates, Inc., purchased an office building in 2006).

In February 2007, Bedi did not receive a distribution check. When he called Dhaliwal to inquire, Dhaliwal was abrupt and rude and told him never to call him again about missing dividends. Dhaliwal said that he would call Bedi if he was not going to send dividends. Bedi received a check in March, but not in April. He did not call Dhaliwal because he did not want to upset him again. Payments resumed in May, but he received no check in November and again did not call. He received a check in December. When Bedi again received no payment in January 2008, he called Dhaliwal, who said business was down because the rains were very heavy. Bedi again offered to help manage the business, but Dhaliwal declined. After Bedi did not receive payments in

---

[4] Dhaliwal testified that he moved the administrative operations of all of the gas station corporations to the Blackhawk Plaza office in 2001. The official lessee of the office was Dhaliwal and Associates, which was why that corporation's name was on the office nameplate. He did not formally notify the shareholders of the relocation of Kismat's office until November 2011, and he did not ask them to approve the move. He took money from Kismat's account to pay part of the rent without informing the Kismat board or getting its approval.

February or March, he called Dhaliwal again.  Dhaliwal "immediately came up on the phone and . . . said, Chevron is not going to do [environmental] upgrades of the station, and . . . they will not renew the lease of the station, and the value of our business is zero." Dhaliwal did not provide any other details and did not respond to Bedi's request to review the Chevron letter.[5]  Bedi asked for a meeting, but the meeting did not occur until May due to Dhaliwal's claimed scheduling conflicts.

The May 2008 meeting between the Bedis and Dhaliwal again took place in the Dhaliwal and Associates office in Blackhawk Plaza.  Dhaliwal immediately informed Bedi that Kismat had borrowed $43,000 from Dhaliwal's son, Baghdeep Dhaliwal (Baghdeep).[6]  When Bedi asked why a loan was necessary, Dhaliwal said the company had lost $43,000 in 2006.  Bedi objected to the fact that Dhaliwal took out a loan without informing him, and Dhaliwal responded that Bedi should not complain because he had recouped his original investment.  Dhaliwal handed Bedi two documents, a spreadsheet purporting to show Kismat's annual income and expenses from 2001 to 2007, and a Service Station Computer Systems, Inc. (SSCS)[7] income and expense statement for 2006. Dhaliwal handwrote a notation on the 2006 SSCS statement indicating that the $150,000 distributed to shareholders in 2006 was an overdistribution, which needed to be repaid to the company.

Following the meeting, Bedi examined the spreadsheet and noted that it included the $182,000 cost incurred, but not the $175,000 capital investment made, for the carwash upgrade.  At a June 2008 meeting, Dhaliwal acknowledged the error and added handwritten notations to the 2006 SSCS statement showing that the company made a net profit in 2006 of more than $131,000.  However, he never corrected his prior assertion that there had been a $150,000 overdistribution in 2006.  Dhaliwal did not respond to Bedi's requests for a corrected spreadsheet, for details and documentation of the loan, or

_____

[5] Chevron actually continued to renew the lease through 2010.

[6] At trial, Dhaliwal testified that the loan was from MB Enterprises, Inc., a Dhaliwal corporation whose majority shareholder was Bhagdeep.

[7] SSCS is a Chevron-provided computerized accounting system.

for the company's financial records. Bedi testified, "It was not a happy meeting because when I would ask him a question, he would abruptly stop me and . . . sometimes yell at me or again [ask] why I am asking these questions."

At a second meeting in June 2008, Dhaliwal handed Bedi a document but immediately interrupted Bedi when he tried to look at it. Bedi said that Dhaliwal came up behind him, yelling "[Y]ou are going senile. You need to . . . see a doctor. . . . You don't understand these documents. Your mathematics is worse than grade three." Dhaliwal said that he would charge Bedi $500 an hour if Bedi asked him for more information. He then asked Bedi for an additional $50,000 investment in the business, purportedly because it was operating at a loss. Bedi refused unless he received information about the loan and the financial condition of the company.

During the spring and summer of 2008, Bedi sent Dhaliwal many letters or emails asking for Kismat financial records and offering to participate in management of the company. Dhaliwal repeatedly told Bedi to come by the office to review the records, but Bedi asked that records be mailed to him because of the abuse and obfuscation he experienced at the office. Bedi eventually received some financial statements, but they did not explain why the company was losing money. In correspondence, Bedi also objected to Kismat's payment of certain management costs, which he insisted should been covered by Dhaliwal's 20 percent management fee. Bedi further objected to Kismat's repayment of the alleged loan until the reason for the loan was clarified, and objected to Kismat's paying a share of the Dhaliwal and Associates office expenses (which were shared by all of the gas station corporations), all to no avail.

Bedi sought legal advice and filed this lawsuit in 2008. He received no dividends for the entire year of 2008. Kismat paid monthly dividends of $3,000 from June to December 2009, a total of $7,500 in dividends in 2010, and no dividends in 2011 or thereafter until the time of trial in March 2012.

C.    *Kismat's Financial Records*

Through the discovery process, Bedi finally gained access to Kismat's records.[8] He discovered that the recordkeeping system, controlled by Dhaliwal, incorporated few if any reconciliations or double checks to ensure that the information was accurate and that all funds were accounted for, even though the station was a cash business with about $44 million in gross revenues for the relevant time period. All company checks were written by Dhaliwal or at his direction and were recorded in a journal rather than a check ledger. The journal was a simple list of the check numbers, dates, payees and amounts that was not reconciled with the company's bank statements or cross-referenced with invoices being paid. A clerical worker entered data from the station's cash register receipts, invoices, and the check journal into the SSCS, and Dhaliwal personally entered expenses such as payroll and rent. Notations in SSCS indicated when expenses had been paid, but usually did not include cross-references to check or invoice numbers. Kismat did not use any other computerized or handwritten accounting system that produced balance sheets, nor did it employ or engage an accountant or bookkeeper. In contrast, Dhaliwal Enterprises, Inc. retained an accountant and maintained complete and balanced records.

There were other questionable accounting practices. Cash to supply the ATM machine was disbursed via corporate checks made out to "cash," and only Dhaliwal and Bhagdeep replenished the machine. Checks for ATM cash replenishment were not reconciled with reports of amounts the ATM machine dispensed to customers. Until late 2004, gas station cash receipts were deposited at the bank by Dhaliwal or Bhagdeep.

---

[8] Dhaliwal apparently resisted producing discovery until May 2010, when he produced voluminous documents. In January 2011, Bedi filed a second amended complaint that asserted personal and derivative claims (including claims for fraud and breach of fiduciary duty) against Dhaliwal and the seven other corporations he controlled, excluding Kismat. In March 2012, the court granted a defense motion for summary adjudication of the derivative claims on the ground that Bedi failed to make a prelitigation demand on the Kismat board of directors or establish that such a demand was futile. Bedi appealed that order, but later dismissed his appeal. (*Bedi v. Dhaliwal* (July 13, 2012, A135397).)

Notations of these "safe drops" were handwritten on cash register reports and then transferred to daily reports for Dhaliwal, not all of which were retained. Kismat made and received loans to and from Dhaliwal's other corporations by check until 2006 and thereafter by online banking transfer among the companies' accounts. The only record of these loans (aside from the bank statements showing the transfers) was the cash journal until 2006 and thereafter Dhaliwal's handwritten notations on loose sheets of paper, not all of which were retained. These notations were not linked to identified accounts where evidence of the loans could be found. There also were no formal corporate approvals for the loans. Similarly, there was no corporate approval for the relocation of the Kismat office from Dhaliwal's home to the Blackhawk Plaza office or for payment of shared office and other management expenses. Kismat's tax returns were prepared by a firm that did not employ accountants or conduct any review of Kismat's financial records. The firm simply took summary income and expense information provided by Dhaliwal (without backup documentation) and "plug[ged] them into the tax returns." At times, Dhaliwal directed the firm not to use certain data on the income and expense statement he had provided.

Bedi's experts testified that there were multiple discrepancies in the financial records. The check journal was not always accurate, i.e., it did not match the cancelled checks attached to the bank statements. Dhaliwal's handwritten notations of safe drops frequently did not match (within a $25 human error allowance) the point-of-sale receipt printed out from the cash register, the SSCS month-to-date (MTD) report, or deposits listed on the bank statements. Total checks written for cash to be deposited in the ATM machine substantially exceeded the total cash dispensed from the machines as reflected in the ATM company's reports. Dhaliwal reported that the intercompany loans had stopped in 2008, but a Bedi expert discovered they had continued by way of different bank accounts. There was no documentation of how office expenses were allocated among the companies, and Bedi's expert could not deduce a consistent allocation pattern from the companies' financial records. One of Bedi's experts testified it would take a team of five auditors about two years to fully audit Kismat's financial records. To answer many of the

8

questions he had about the corporation's finances, the expert would have had to create from scratch detailed financial documents such as ledgers or balance sheets from the 300 to 400 boxes of papers Dhaliwal produced in discovery.

Another Bedi expert testified that all three signs of accounting fraud (as described by the Financial Accounting Standards Board) were present in this case:  motivation (a need to commit the fraud), opportunity (complete control over a business and its financial records), and rationale (self-justification for the fraud).  The motivation was Dhaliwal's substantial financial obligations incurred in managing multiple businesses and buying large properties during the relevant time period.  The opportunity was Dhaliwal's complete control over the business and the accounting process, with few or no reconciliations or double checks.  The rationale was Dhaliwal's apparent view that the companies were in essence a single proprietorship in which all the money was at his disposal to use as he saw fit to keep the companies operating with minimal reserves of operating capital.

D.    *Damages Evidence*

Bedi's experts provided testimony and opinions relevant to the issue of damages. First, from 1999 through 2010, shareholder distributions were paid in ratios of 64, 24 and 12 percent rather than 55, 30 and 15 percent.  The payment percentages resulted from the initial deduction of 20 percent of net profits as Dhaliwal's management fee and distribution of only the 80 percent remainder according to the shareholders' percentage holdings.  In light of the disarray and improprieties discovered in management of the companies, it was opined that Dhaliwal had not earned the 20 percent management fee and distributions therefore should have been made in the equity ratios of 55, 30 and 15 percent.  Applying those ratios to past distributions actually made by Kismat, the expert opined that Bedi should have received an additional $93,840.  Second, $84,750 to $96,200 was missing from purported deposits to the ATM machine, and it was opined that Bedi should receive 30 percent of these missing funds, or $25,425 to $28,860.  Third, $303,306 to $435,000 was missing from the purported safe drops (bank deposits of cash receipts at the station); Bedi's 30 percent share would be $90,992 to $130,717.  Fourth,

9

Kismat's cash flow ("proof of cash") from 1999 to 2010 was analyzed by taking income and expense information from the tax returns, adjusting for noncash deductions (depreciation and amortization), and comparing the result to the end-of-the-year cash balances reported on the bank statements. Tax returns indicated that a cumulative $83,870 in cash should be in the bank accounts but was not; Bedi's 30 percent share of this amount would be $25,161. Finally, three alternative estimates were made of net income from the Kismat station not reported by Dhaliwal: (a) a comparison of all of the net income (difference between income and expenses) reported on two SSCS reports and the net income reported on the SSCS profit and loss statements from 1999 to 2010,[9] which showed an apparent understatement of net income of $1,654,248 (30 percent of which is $496,274); (b) an adjustment of the prior figure based on Dhaliwal's unconfirmed assertion that sales tax was included in SSCS reports before 2006 and excluded thereafter, which resulted in an understatement of net income of $350,694 (30 percent of which is $105,208); and (c) a comparison of the performance of the Kismat station to the performance of comparable Chevron stations operated by other Dhaliwal gas station corporations,[10] which suggested that Kismat's earnings before income taxes, depreciation and amortization (or EBITDA) was understated by $677,100 (30 percent of which is $203,130).[11] Bedi's counsel asked the jury to award Bedi a total of $774,852 in compensatory damages with prejudgment interest.

---

[9] SSCS reports were only available for 2003 on, so the expert extrapolated figures for the prior years.

[10] Another expert similarly opined that the Kismat station underperformed as compared to the other Dhaliwal gas stations (with one exception), based on his comparison of each station's profit per gallon of gasoline sold as stated on SSCS reports.

[11] Bedi's counsel noted in closing argument that an expert's "gross margin" analysis resulted in damages figures that overlapped with his EBITDA analysis and thus should be disregarded by the jury if it awarded the EBITDA damages. Therefore, we do not discuss the gross margin analysis here.

E.	*Judgment*

The jury found Dhaliwal liable for breach of fiduciary duty and fraud (both concealment and intentional misrepresentation). It specifically found Dhaliwal took $1,605,695 that belonged to Kismat and that Bedi was entitled to 30 percent of that amount, $481,708, with prejudgment interest. The jury also found that Dhaliwal acted with malice, oppression or fraud and awarded Bedi $875,000 in punitive damages.

In a later brief bench trial, the court denied Bedi's attempt to impose alter ego liability on the Defendant Corporations. The court awarded costs to Bedi and denied costs to Dhaliwal and the Defendant Corporations. The final judgment against Dhaliwal was for $1,575,885.00, together with costs of $88,285.07, and postjudgment interest of 10 percent per annum.

## II.	DISCUSSION

Dhaliwal does not challenge the sufficiency of the evidence to support the jury findings or damage awards.[12] Rather, he raises three legal challenges to the verdict: he argues that Bedi's claims were derivative in nature and not properly brought as individual causes of action, that the court erroneously instructed the jury that it could award Bedi additional distributions and missing corporate funds based on a 30 percent pro rata share, and that the trial court erred in not instructing the jury on Dhaliwal's statute of limitations defense. The Defendant Corporations challenge the court's denial of their cost bill. We affirm the judgment in its entirety.

A.	*Individual Causes of Action*

Dhaliwal first argues that Bedi's claims were not properly brought as individual claims. The court ruled on this issue in the context of a motion for judgment on the pleadings, which we review de novo. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989.) We conclude the trial court did not err in allowing the individual causes of action to proceed.

---

[12] Dhaliwal does not separately challenge the award of punitive damages, but only contends that the punitive damage award cannot be sustained if the award of compensatory damages was erroneous.

11

The leading case on the distinction between derivative and individual causes of action is *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93 (*Jones*). *Jones* explains: "A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act. Thus, 'the action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' [Citations.] . . . '[A]lthough the corporation is made a defendant in a derivative suit, the corporation nevertheless is the real plaintiff and it alone benefits from the decree; the stockholders derive no benefit therefrom except the indirect benefit resulting from a realization upon the corporation's assets. The stockholder's individual suit, on the other hand, is a suit to enforce a right against the corporation which the stockholder possesses as an individual.' [Citation.]" (*Id.* at pp. 106–107.) *Jones* clarified that "[t]he individual wrong necessary to support a suit by a shareholder need not be unique to that plaintiff. The same injury may affect a substantial number of shareholders. If the injury is not incidental to an injury to the corporation, an individual cause of action exists." (*Id.* at p. 107.)

These generally articulated principles were not difficult to apply on the facts presented in *Jones*. The plaintiff alleged that the majority shareholders of the corporation breached their fiduciary duty by creating an independent holding company to which they transferred their control block of shares, making their own interests more marketable and destroying the market value of the shares held by the minority. (*Jones, supra,* 1 Cal.3d at pp. 102–105.) In these circumstances, the court explained, the plaintiff "does not seek to recover on behalf of the corporation for injury done to the corporation by defendants. Although she does allege that the value of her stock has been diminished by defendants' actions, she does not contend that the diminished value reflects an injury to the corporation and resultant depreciation in the value of the stock. Thus the gravamen of her cause of action is injury to herself and the other minority stockholders." (*Id.* at

12

p. 107; see also *Smith v. Tele-Communication, Inc.* (1982) 134 Cal.App.3d 338, 341–343 [minority shareholder's suit to share in tax savings payment to majority shareholder was properly brought as individual action because corporation was unaffected]; *Sheppard v. Wilcox* (1962) 210 Cal.App.2d 53, 55–56, 64 [minority shareholder's suit challenging directors' decision to issue additional common stock, which caused them to become majority shareholders, was properly brought as individual action because corporation unaffected].)

It has been less obvious how to apply these principles where a majority shareholder who is also a manager of the corporation allegedly obtains a disproportionate share of the corporation's earnings, and deprives the plaintiff of his/her proper share, through abuse of management authority. As *Jones* explains, majority shareholders have a fiduciary duty not only to the corporation but also directly to the minority shareholders: "[M]ajority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business. [Citations.]" (*Jones, supra,* 1 Cal.3d at p. 108.) In sum, there is a "comprehensive rule of good faith and inherent fairness to the minority in any transaction where control of the corporation is material." (*Id.* at p. 112.)

In cases involving sale of a corporation or of corporate assets that are allegedly designed to disproportionately benefit the majority shareholders, courts have held that minority shareholders' claims are individual. (See *Low v. Wheeler* (1962) 207 Cal.App.2d 477, 481–482 [where majority shareholder caused plaintiff's stock to be sold first at lower price, withholding information that he was negotiating higher price for his own stock, "the wrong . . . was one to plaintiff as an individual, because the corporation was about to be dissolved"]; *Crain v. Electronic Memories & Magnetics*

13

*Corp.* (1975) 50 Cal.App.3d 509, 515–516, 521–522 [where majority shareholders sold corporation's assets, made unsecured loan of sale proceeds to themselves, and purchased all minority shares except the founders' promotional shares, leaving those shares in the " 'shell' corporation" worthless, the founders had individual causes of action]; see also *Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 415–416, 428–429 [where general partner caused merger and cash-out of limited partners' interest in a partnership, then sold partnership assets to third party for more than they were valued for purposes of the cash-out, limited partners' claims were individual causes of action].)

In cases of alleged mismanagement by majority shareholders leading to the corporation's demise, courts have held that minority shareholders' claims are derivative only, even if the majority shareholders are accused of "wrongfully obtaining [the corporation's] assets" for themselves. (*Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108, 1111–1113, 1115–1116; see *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 125–126 [claim of mismanagement by majority shareholder with complete authority over corporation was derivative only where alleged damages were lost future profits of corporation]; *Schuster v. Gardner* (2005) 127 Cal.App.4th 305, 313–315 (*Schuster*) [claim of mismanagement is derivative only, even though majority shareholders responsible for mismanagement sold stock while concealing financial state of company, leading minority shareholders to hold onto stock that lost value]; see also *Rankin v. Frebank Co.* (1975) 47 Cal.App.3d 75, 80–82, 95 [claim that majority shareholders diverted corporate assets was derivative only].)

There is a split of authority on whether claims that managing majority shareholders paid themselves excessive compensation are derivative or individual claims. In a pre-*Jones* decision, a minority shareholder in a closely held corporation alleged that the majority shareholders (who were also managers) paid themselves excessive salaries and converted corporate assets to their own use, causing the corporation to go into receivership and its stock to become worthless. (*Shenberg v. DeGarmo* (1943) 61 Cal.App.2d 326, 328–329.) The court held the claim was derivative only: "the wrongful and malicious appointment of a receiver, the conversion and dissipation of the

14

assets of the corporation and the payment of excessive salaries to the managing directors . . . are wrongs to the corporation itself." (*Id.* at p. 331; see also *Thompson v. Price* (1967) 251 Cal.App.2d 182, 188–189 (*Thompson*) [excessive compensation award made in favor of corporation but without discussion of whether it could only be brought as a derivative action].)  On the other hand, a division of this District has held that excessive compensation claims alone, brought by a minority shareholder of a closely held corporation against majority shareholders/managers, were properly brought as individual causes of action.  (*Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1245–1248, 1258 (*Jara*); see also *De Martini v. Scavenger's Protec. Assn.* (1935) 3 Cal.App.2d 691, 692–695, 697–699 [affirming award in minority shareholders' individual suit for excessive compensation of majority shareholders who were also employees, without discussing whether it was properly brought as individual cause of action].)  The *Jara* court held that "[t]he gravamen of [the minority shareholder's] complaint is that he was deprived of a fair share of the corporation's profits as a result of defendants' generous payment of executive compensation to themselves." (*Jara*, at p. 1258.)

Significantly, in *Jara*, the minority shareholder made no claim of mismanagement or dissipation of corporate assets; on the contrary, he was pleased with the way the majority shareholders ran the business.  "He does not claim that the company would have experienced still greater prosperity and growth if the salaries had been smaller but rather maintains that the payment of generous executive compensation was a device to distribute a disproportionate share of the profits to the two officer shareholders during a period of business success." (*Jara, supra,* 121 Cal.App.4th at p. 1258)  The court held that the particular circumstances before it did not implicate the policies behind the rule requiring suits alleging injury to a corporation to be brought by the corporation itself or in a derivate action.  "The objective of preventing a multiplicity of lawsuits and assuring equal treatment for all aggrieved shareholders does not arise at all when there is only one minority shareholder.  The objective of encouraging intracorporate resolution of disputes and protecting managerial freedom is entirely meaningless where the defendants constitute the entire complement of the board of directors and all the corporate officers.

15

And the policy of preserving corporate assets for the benefit of creditors has, at best, a very weak application where the corporation remains a viable business." (*Id.* at p. 1259.)

The parties disagree on application of these precedents to the instant case. Dhaliwal argues that the gravamen of Bedi's claim is misappropriation of corporate assets and thus mandate that the claims be brought as a derivative action only. He distinguishes *Jara* on two grounds. First, he notes that the *Jara* majority shareholders allegedly used their majority status to cause *the corporation to take action* (i.e., approved excessive compensation) that disadvantaged the minority shareholder, whereas Bedi alleged that Dhaliwal took funds without corporate action (i.e., essentially stole from the corporation and caused corporate losses). Second, he notes that the *Jara* court emphasized the absence of alleged harm to the corporation, and counters that Bedi alleged Kismat underperformed relative to the other gas station corporations due to Dhaliwal's mismanagement. Bedi argues, and the trial court ruled, that *Jara* controls here and under *Jara* Bedi properly brought his claims as individual causes of action.

We agree that the gravamen of Bedi's claims was the damage he suffered personally, rather than injury to the corporation, and that he was entitled to maintain his claims individually.

First, Bedi's fraud claims are individual and not derivative causes of action. Claims of fraud by minority shareholders against managers who are also majority shareholders are individual causes of action even if the alleged harm is loss in the minority shareholders' stock value. (See *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 170–171, 184 (*Small*) [false or misleading statements by majority shareholders who were also directors, which induced minority shareholders to retain stock that later lost value, is an individual cause of action if personal reliance on statements is adequately alleged]; *Schuster, supra,* 127 Cal.App.4th at pp. 314–315 [same]; *Smith v. Tele-Communication, Inc., supra,* 134 Cal.App.3d at p. 343 [allegation that majority shareholder's payment of all tax savings to itself without informing minority shareholder constituted fraud was properly brought as an individual cause of action]; *Sheppard v. Wilcox, supra,* 210 Cal.App.2d at p. 64 [essence of suit challenging

16

increase in amount of common stock was fraud on minority shareholders, an individual cause of action]; *Campbell v. Clark* (1958) 159 Cal.App.2d 439, 440–441, 443 [essence of minority shareholder's claim was fraudulent inducement to sell shares at low price, an individual cause of action].)  In *Small* and *Schuster,* the minority shareholders' individual fraud claims were nevertheless dismissed because of a failure to plead personal reliance on the allegedly false and misleading statements.  (*Small*, at p. 185; see also *Schuster*, at pp. 314–315.)  Here, however, Bedi alleged reliance on Dhaliwal's false statements and concealment and the jury found Dhaliwal liable on those causes of action.  Because the jury awarded the same damages on all of Bedi's successful causes of action, we would affirm the judgment on this ground alone.

Second, Bedi's breach of fiduciary duty claim, reasonably construed, alleges misappropriation of his shareholder distributions rather than looting of corporate assets.  Significantly here, Kismat is a subchapter S corporation, meaning that for tax purposes its profits are treated as personal income of the shareholders in proportion to the shareholders' interests.  (1 Ballantine & Sterling, *supra,* § 60.01[2][d], pp. 4-11 to 4-12 (rel. 119-6/2013).)  In this context, there was no meaningful distinction between Kismat profits at the corporate level and the shareholders' personal pro rata interest in the profit distributions.[13]

Moreover, the Supreme Court has suggested that certain claims can be brought either as derivative or individual causes of action.  (*Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 531 [where both corporation and individual who was induced to form and buy stock in the corporation were injured, "the dual nature of the injury does not necessarily preclude an action by the stockholder as an individual"]; see also *Rankin v. Frebank Co., supra,* 47 Cal.App.3d at p. 96 ["shareholders' derivative suits cannot all

---

[13] To ensure that corporate creditors remain protected, closely held corporations must still take formal corporate action to make an actual distribution of profits. (2 Ballantine & Sterling, *supra,* § 141.03[2][a], pp. 8-10 to 8-12 (rel. 115-7/2012).)  It is undisputed, however, that corporate formalities were generally not followed by Kismat, and Kismat never required shareholder approval prior to any shareholder distributions.

be pressed into a single mold"]; but see *Schuster, supra,* 127 Cal.App.4th at pp. 311–312 [derivative and individual causes of action " 'are mutually exclusive' "].) Whether or not Kismat may have also had claims against Dhaliwal, we conclude, as the court did in *Sutter v. General Petroleum Corp.*, that Bedi's prosecution of the claims as individual causes of action was permissible.

B.      *Damages*

Dhaliwal argues the trial court erred in instructing the jury that Bedi could recover the difference between the distributions Bedi actually received between 1999 and 2012 (about 24 percent of total distributions) and 30 percent of those total distributions.[14] Dhaliwal also argues that it was error to allow recovery of 30 percent (rather than 24 percent) of missing corporate funds. Dhaliwal contends Bedi was entitled at most to only 24 percent of both the distributions and any missing corporate funds because he and the other shareholders had agreed to pay Dhaliwal 20 percent of total net profits as a management fee. At bottom, Dhaliwal objects to the implication in the instruction that he was not entitled to receive his 20 percent management fee.

Dhaliwal first suggests the trial court committed legal error. We review questions of law de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800–801.) He argues "the remedy for a defaulting employee or manager is to require that employee or manager to pay back the money that he allegedly misappropriated or lost through incompetence; it is *not* recovery of the salary already paid to that manager." However, he cites no authority for that proposition, and *Thompson, supra,* 251 Cal.App.2d 182 holds to the contrary. In *Thompson*, a manager who was also a majority shareholder "performed fraudulently in his own interest and in violation of his fiduciary duties." (*Id.* at p. 189.) The appellate court held that the trial court should have required the manager to repay *all* of his managerial salary rather than the portion the trial court deemed excessive compensation. *Thompson* first held that it was the defendant manager/fiduciary who had the burden to

---

[14] Although Dhaliwal does not demonstrate that he raised this argument in the trial court, we have exercised our discretion to address the issue on the merits. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742.)

18

prove that "the drawings he manipulated were fair and reasonable." (*Thompson, supra,* 251 Cal.App.2d at p. 188.) The court further held that, having fraudulently kept the corporate books and records for personal advantage, the corporation "should not compensate [the manager] for fraudulent mismanagement" and "should not pay [the manager] for services, whether valuable or not, performed fraudulently in his own interest and in violation of his fiduciary duties." (*Id.* at pp. 188–189.)

Dhaliwal also argues the instruction was not supported by substantial evidence. Substantial evidence to support a jury instruction is evidence that a reasonable jury could find persuasive. (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1243.) Dhaliwal argues the only evidence that Dhaliwal did not earn his management fee was the bare opinion of a Bedi expert that the fee was "unwarranted." We disagree. There was ample evidence in the record that, as a manager, Dhaliwal performed "fraudulently in his own interest and in violation of his fiduciary duties." (See *Thompson, supra,* 251 Cal.App.2d at p. 189.) Substantial evidence supports findings that Dhaliwal increased the company's overhead expenses (office rental and supplies and payroll for office personnel and a joint operations manager) to his benefit without board approval; siphoned off cash from the company's ATM machine and bank deposits of cash receipts; loaned Kismat funds to other corporations without interest; failed to perform his duty of maintaining complete and accurate corporate records; failed to observe corporate formalities; and caused the company to underperform as compared to his other gas station corporations.

Finally, Dhaliwal argues the instruction allowed Bedi to recover excessive damages. Dhaliwal argues the corporation would have had to hire a manager even if Dhaliwal had been fired, so the true measure of Bedi's damages was still 30 percent of profits *after* a management fee had been paid to someone. We disagree. First, *Thompson* held that a corporation should not be required to pay a manager for fraudulently performed services that breached his fiduciary duties "*whether valuable or not*." (*Thompson, supra,* 251 Cal.App.2d at p. 189, italics added.) The implication in *Thompson* is that the repayment requirement is justified on equitable grounds. Second, the jury could reasonably conclude that any necessary management expenses were

already being paid by Kismat separate and apart from Dhaliwal's 20 percent charge, including Kismat's share of the office expenses and the salaries or expenses of Bhagdeep and an assistant manager who oversaw the gas station's day-to-day operations.

C.      *Statute of Limitations Defense*

Dhaliwal argues the trial court erred in refusing to instruct the jury on his statute of limitations defense.  We believe Dhaliwal has forfeited this argument, but we in any event reject the claim on the merits.

Dhaliwal pled the statute of limitations as an affirmative defense, and presented a motion in limine seeking to preclude introduction of any evidence relating to recovery of Dhaliwal's management fee and for nonpayment or underpayment of distributions for any period more than four years before Bedi filed suit in 2008.  The court denied the in limine motion, finding that there were factual disputes regarding when Bedi was put on notice of his claims.  Dhaliwal then submitted proposed instructions on the statute of limitations defenses to fraud and breach of fiduciary duty claims, and the late discovery rule (CACI Nos. 1925, 4120).

Both prior to and following closing argument, the court expressed concern about the issue.  After closing argument, and prior to instruction of the jury, the court observed that the defense had presented no argument on the question and consequently "nobody on that jury is going to have any foggy idea what you're talking about."  Defense counsel took the position that the jury could itself tie the instruction to the evidence and conclude that Bedi knew about the management fee and knew or had reason to know of issues with Bhagdeep's role as operations manager as early as 1999.  The court noted, however, that the critical issue on application of the statue of limitations was when Bedi knew or should have known about Dhaliwal's wrongdoing.  The court ultimately declined to instruct the jury on the defense: "[E]ven if . . . there was insufficient evidence for . . . defendant to sustain his burden of proof on the statute of limitations[,] [i]t wasn't argued.  It's not a question included in the verdict form. . . . You didn't mention it in your opening statement.  You didn't specifically present any evidence except there were some dates given.  You didn't give anybody an opportunity to talk about late discovery."  Dhaliwal's

20

motion for a new trial based on to the failure to give the statute of limitations instruction was also denied.

Dhaliwal selectively quotes from the trial court's ruling and suggests the instructions were not given only because the court concluded they were not supported by substantial evidence. This is a distortion of the record. The court articulated several reasons for its decision, most of which Dhalwal does not challenge. Because he fails to address the alternative grounds for the court's ruling (and thereby show the alleged substantial evidence error caused him prejudice), his argument is forfeited. (See *Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772 [appellant bears burden to show prejudice from trial court's error].) In any event, we agree with the trial court that the instruction was not supported by substantial evidence in the trial record.

In reviewing a claim that the court erred in refusing to give an instruction because it was not supported by substantial evidence, we review the evidence in the light most favorable to the party who sought the instruction. (*Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358.) Dhaliwal argues that there was evidence that Bedi became aware that Dhaliwal had moved the operations of Kismat to a site other than his home as early as 1999 and that Bedi knew that Dhaliwal's son Bhagdeep was acting as operations manager for Kismat as early as 1999. He insists that "[i]f the jury credited this testimony, it could conclude that Bedi was aware of circumstances that should have put him on inquiry notice about purported fraud or concealment with respect to Dhaliwal's entitlement to a management fee. If the jury reached such a conclusion, it could well determine that the statute of limitations barred recovery for at least part of the damages that Bedi claimed."

But, Dhaliwal does not explain here, and he did not even attempt to explain to the jury in the trial court, how an informal meeting about Kismat at a "Dhaliwal & Associates" office put Bedi on notice that Dhaliwal had relocated the Kismat office, paying the expenses of that office from Kismat funds, much less suggest that Dhaliwal was mismanaging the company or siphoning off corporate funds, the core claims of Bedi's lawsuit. Similarly, Dhaliwal does not and did not explain why evidence that Bedi

21

might have known as early as 1999 that Bhagdeep was working part-time as an operations manager at Kismat's gas station would have put Bedi on notice that Dhaliwal was paying Bhagdeep from Kismat funds rather than the 20 percent management fee, or that Dhaliwal was otherwise diverting money from the company.

There was no error.

D. *Costs*

The Defendant Corporations argue the trial court erred in failing to award them costs. They contend that they were "prevailing part[ies]" as a matter of law pursuant to Code of Civil Procedure section 1032, subdivision (a)(4) (section 1032(a)(4)),[15] because they were defendants against whom Bedi (both suing individually and suing on behalf of Kismat) did "not recover any relief." The general rule under this portion of section 1032 is that " 'One defendant who prevails may recover costs even though the plaintiff recovers against another defendant.' [Citation.] [¶] . . . [H]owever, there is an exception: 'In those instances in which several defendants are united in interest or join in making the same defenses in the same answer, the prevailing defendant definition in [section] 1032(a)(4) *does not apply* and the defendant against whom the plaintiff does not recover is not entitled to costs as a matter of right. Instead the allowance or disallowance of costs to the prevailing defendant lies within the sound discretion of the court, as does the apportionment of those costs, if allowed.' [Citation.] Put another way, 'where one of multiple, jointly represented defendants presenting a unified defense prevails in an action, the trial court has discretion to award or deny costs to that party.' [Citation.]" (*Wakefield v. Bohlin* (2006) 145 Cal.App.4th 963, 984 (*Wakefield*), disapproved on other grounds by *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1330.) After extensive written and oral argument on the issue, the trial court denied the Defendant Corporations' cost bill in its entirety. We affirm.

Although the court's written order is terse, it appears the court accepted Bedi's argument that the prevailing party determination and related issue of allocating costs

---

[15] All further statutory references are to the Code of Civil Procedure.

were committed to the court's discretion because Dhaliwal and the Defendant Corporations shared a unity of interest in the litigation. Dhaliwal argues that *Wakefield* and similar cases applying the unity of interest exception are wrongly decided. We review this question of law de novo. (*Ghirardo v. Antonioli, supra,* 8 Cal.4th at pp. 800–801.) Shortly after the parties briefed the cost issue in the trial court, the Second District published an opinion questioning, in dicta, whether the *Wakefield* line of cases were correctly decided. (*Zintel Holdings, LLC v. McLean* (2012) 209 Cal.App.4th 431, 440–443 (*Zintel*).) *Zintel* notes that the Legislature eliminated "united in interest" language from section 1032(a)(4) when it rewrote the statute in 1986 and observes that none of the *Wakefield* line of cases "fully addresses the change in the underlying statutory language." (*Zintel,* at pp. 441–442.) The court comments: "Whether the Legislature intended the continued use of that doctrine seems doubtful, . . . since it created four categories of litigants who automatically qualify as prevailing parties ([§ 1032(a)(4)])[,] provided an award of costs must be made to those litigants '[e]xcept as otherwise expressly provided by statute' (§ 1032, subd. (b)), and eliminated the language in the prior version of section 1032 upon which the unity of interest principle was based." However, the court declined to expressly rule on the issue, which was not directly before it in the case. (*Zintel,* at p. 442.)

We are not persuaded that the *Wakefield* line of cases is incorrect. *Zintel* fails to address the rationale of *Slavin v. Fink* (1994) 25 Cal.App.4th 722 (*Slavin*), the earliest of these cases, which reasons that a situation in which a prevailing defendant and a nonprevailing defendant shared a unity of interest in the litigation was a "situation[] other than as specified" under the revised statute. The current law expressly states that such situations are committed to the trial court's discretion. (*Slavin*, at pp. 725–726.) *Slavin*'s construction of the statute is reasonable, and in the 19 years since *Slavin* was decided at least three other courts have agreed with its conclusion,[16] no court has held to the

---

[16] See *Wakefield, supra,* 145 Cal.App.4th at pp. 984–985; *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1075, disapproved on

23

contrary, and the Legislature has not amended the statute to overrule *Slavin*. The defendants here do not present us with legislative history or any other material that might persuade us that *Slavin*'s interpretation was wrong. We agree with the *Wakefield* court that "[a]lthough the statutory language has changed, the underlying precept . . . continues to apply." (*Wakefield, supra*, 145 Cal.App.4th at p. 985.) Therefore, we find no reason in this case to disagree with the weight of authority that the unity of interest exception survives the 1986 revision of the statute.

The evidence supports the trial court's implied ruling that Dhaliwal and the Defendant Corporations shared a unity of interest in the litigation. They were represented by the same counsel,[17] they filed joint motions, and the Defendant Corporations' participation in pretrial proceedings (including the summary adjudication of the derivative claims), the jury trial, and the post-jury trial proceedings (including the bench trial on alter ego liability) was indistinguishable from Dhaliwal's. The prevailing party determination, therefore, was committed to the trial court's discretion (§ 1032(a)(4); *Wakefield, supra,* 145 Cal.App.4th at p. 977), and we see no abuse of discretion in the court's determination that the Defendant Corporations were not prevailing parties.

Denial of costs was further justified as an exercise of the court's discretion to allocate costs among prevailing and nonprevailing defendants that share a unity of interest. (§ 1032(a)(4).) As suggested above, the three phases of litigation at issue in the cost proceedings were pretrial, trial, and posttrial. Bedi argued below that the Defendant Corporations had forfeited their claims to costs in the first and third phases of the proceeding, and the Defendant Corporations do not persuasively refute those arguments on appeal.[18] The only remaining cost claim is for costs incurred for the jury trial, and the

---

other grounds by *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 382; and *Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 920.

[17] Dhaliwal and the Defendant Corporations also share counsel on appeal.

[18] As to the pretrial phase of litigation, Bedi argued below that the defense cost bill filed in March 2012, which was the only cost bill to seek recovery of pretrial costs (including costs for the summary adjudication of Bedi's derivative claims), was filed on behalf of Dhaliwal alone and not on behalf of the Defendant Corporations. The

trial court acted well within its discretion in allocating all of those costs to Dhaliwal.  The jury trial focused exclusively on Dhaliwal's personal wrongdoing, the Defendant Corporations were not even mentioned on the jury verdict, and the parties were directed by the court to defer alter ego issues (which directly affected the Defendant Corporations) to a later bench trial.

## III.  DISPOSITION

The judgment is affirmed in its entirety.  Dhaliwal shall pay Bedi's costs on appeal.

---

Defendant Corporations argue on appeal that the March 2012 cost bill was filed on behalf of both Dhaliwal and the Defendant Corporations because it was filed in the name of "Dhaliwal, an individual, *et al.*"  In the final trial court hearing on the cost issue, however, defense counsel conceded that the first cost bill was "filed by Mr. Dhaliwal, based on his [section] 998 [settlement offer].  That included all the derivative claims costs. . . . [¶] But after trial, . . . the Dhaliwal entities filed another memorandum of costs . . . ."  In a supplemental brief, the defendants again conceded that only Dhaliwal filed the first cost bill seeking pretrial litigation costs, and it referred to Bedi's argument that the Defendant Corporations forfeited their claims to such costs as a "hypertechnicality."  We infer the trial court agreed with Bedi and denied pretrial costs to the Defendant Corporations because they never filed a cost bill seeking those costs.  The ruling is supported by court rules.  (See Cal. Rules of Court, rules 3.1700(a)(1), 3.1702(b)(1) [time requirements for filing of cost bill and motion to claim attorney fees].)

As to the post-jury trial phase of the litigation, Bedi argued below that the defense cost bill filed in June 2012, filed on behalf of the Defendant Corporations, sought only costs that were related to the jury trial, and that costs related to a brief bench trial on alter ego liability (at which the Defendant Corporations prevailed) were in any event de minimis.  On appeal, the Defendant Corporations do not dispute these representations, which are supported by substantial evidence in the record.

_____
Bruiniers, J.

We concur:


_____
Jones, P. J.


_____
Needham, J.